**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOVEY ELECTRIC, INC., Respondent.**

No. 91–5915.

United States Court of Appeals, Sixth Circuit.

Argued March 26, 1992.

Decided May 13, 1992.

Aileen A. Armstrong, Deputy Asso. Gen. Counsel, Collis Suzanne Stocking (briefed), Nancy B. Hunt (argued), N.L.R.B., Office of the Gen. Counsel, Washington, D.C., Bernard Gottfried, Regional Director, N.L.R.B., Detroit, Mich., for petitioner.

Timothy J. Ryan (argued), Norman E. Jabin (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, Mich., for respondent.

Before: KENNEDY and SILER, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

KENNEDY, Circuit Judge.

The National Labor Relations Board ("Board") is seeking enforcement of its order finding Hovey Electric, Inc. ("Company") guilty of unfair labor practices. The Administrative Law Judge ("ALJ") hearing the case found that the Company had committed unfair labor practices during a Union representative election held in June 1989. The Board, with some modifications, adopted the ALJ's findings, rulings and conclusions and adopted the recommended order with modifications. For the reasons discussed below, we REVERSE in part and AFFIRM in part.

## I.

Hovey Electric, Inc. is a small electrical contracting firm which employs a work-force of 50 to 55 journeymen and apprentice electricians. The Company has always operated as a non-union shop. In December 1988, James Hovey, the Company's vice president became aware that The International Brotherhood of Electrical Workers, AFL–CIO ("Union") was attempting to organize the Company's employees. Hovey addressed the employees at the Company's annual Christmas party. Two employees testified that during this speech Hovey suggested that if the employees joined the Union, the Company might close. Six other persons attending the Christmas party contend that Hovey never made this statement.

The Union officially notified the Company by letter in early 1989 that it was seeking to organize the Company's employees. In the next few months, Hovey visited various Company job sites to convey to the employees the proper conduct in light of the organization effort. At these visits, Hovey told the employees that no solicitation of membership or discussion of union affairs could be done during work time.

In early March 1989, Hovey was forced to lay off some employees. The Company asserted that the layoffs were the result of a downturn in business. The layoffs were designated permanent. Permanently laid-off employees are ineligible to vote in the upcoming Union election. The Company laid off the employees on March 8th and 10th.

At the meeting where Hovey announced the layoffs, he also told Company foremen that the Company was working on a new wage schedule. The Union filed a representation petition on March 24, 1989. Following notice of the petition, the Company stated that it would not announce or implement the new wage plan as scheduled. On the day before the election, General Manager Ben Thomas spoke with many of the employees trying to persuade them to vote against the Union. During the discussion, Thomas commented that a union would decrease flexibility in work assignments and use of part-time employees.

The Union lost the election by a vote of 26 to 20. The new wage plan, including pay increases to 26 employees, was implemented the next day. Approximately six months later, the Company sent letters to the laid off employees inviting them to apply for positions with the Company. If hired, they would receive the same rate of pay they were receiving when laid off. Only four of the laid off employees responded. Two of the four employees failed to respond further when called by Hovey. The third former employee indicated he wanted to wait six weeks before he came to work and was not heard from again. The fourth agreed to be hired but then took another job. None were rehired.

The Board, in agreement with the ALJ, found that the Company had threatened employees with plant closing upon unionization.[1] These actions violated 29 U.S.C. § 158(a). The Board's order required the Company to cease and desist from the unfair labor practices, rescind the no solicitation rule, and offer the laid off employees reinstatement to the same or equivalent positions. The Board now seeks enforcement of its order.

## II.

The Board's findings of fact are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). The reviewing court must determine whether the Board's conclusions are reasonable in light of the facts of the case. *NLRB v. Paschall Truck Lines*, 469 F.2d 74, 76 (6th Cir.1972). The appeals court may not overturn the order of the Board merely because the reviewing court would have made a different choice if

---

1. The Board also found that the Company violated section 8(a)(1) by imposing a no solicitation rule applicable only to union activities and by offering wage increases as an incentive to vote against union representation. The Company has not raised these issues either in Exceptions to the Decision of the Administrative Law Judge, or in its brief to this Court. We do not address these issues.

**546**

it was hearing the case *de novo.* *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

Section 7 of the National Labor Relations Act ("Act") grants employees the right to self organization and the right to form labor organizations and engage in activities for the purpose of collective bargaining. 29 U.S.C. § 157. It is an unfair labor practice for an employer to interfere or restrain employees in their exercise of section 7 rights, 29 U.S.C. § 158(a)(1), or to discriminate in a manner which discourages or encourages Union membership. 29 U.S.C. § 158(a)(3).

### III.

The Company disputes the factual conclusions of the ALJ and the Board. First, the Company disputes the Board's finding that the Company violated section 8(a)(1) by threatening plant closure or loss of jobs if the Company was unionized. Second, the Company asserts that substantial evidence does not support a finding that it laid off employees to prevent them from voting in the Union representation election thus violating section 8(a)(3) and (1). We will address these assertions in order.

■ This Circuit has held that it is a violation of section 8(a)(1) of the Act to threaten employees with plant closure or loss of jobs upon unionization. *NLRB v. Garon,* 738 F.2d 140 (6th Cir.1984). The Board found that at the Company Christmas party on December 23, 1987, Hovey told the employees that he would close down the Company if the employees voted for unionization. The Board also found that on May 30, 1988, the day before the election, General Manager Thomas told employees that the existence of a union would limit the Company's flexibility to use part-time employees and to shift work assignments during work slow downs.

Two employees, Joseph Protasiewicz and Paul Cole, testified that they heard Hovey's alleged threat of plant closure at the Christmas party. Several other employees testified that Hovey had made no such statement or that they did not recall any such remark. The ALJ, with no explanation, credited the testimony of Protasiewicz and Cole. The Board's duties include the resolution of questions of fact and credibility. An appellate court does not normally disturb the credibility assessment of the Board. *NLRB v. Howell Automatic Machine Co.,* 454 F.2d 1077, 1079 (6th Cir. 1972). We find that the ALJ could reasonably have found the testimony of Protasiewicz and Cole credible. The fact that more people testified that no such statement was made does not automatically afford the testimony of those people more credibility. No independent evidence such as a recording of the speech or Hovey's speech notes were introduced. Although an explanation of why the ALJ chose to credit the two witnesses, one of whom was a Union organizer who was seeking back pay, would have been preferable, we find the Board's decision that Hovey made a threat to close the plant at the annual Christmas party supported by substantial evidence, and decline to reverse that portion of the Board's decision.

■ The Company also contends that the Board erred in finding that the General Manager of the Company had made a statement to employees that a union might require the Company to change lay off procedures. There is no dispute that Ben Thomas made a speech to employees the day before the election. The entire speech was tape recorded and a transcript was reviewed by the ALJ. The Board confirmed the ALJ's findings that the speech violated section 8(a)(1).

The ALJ found several portions of Thomas' speech objectionable.[2] Most of Thomas'

**2.** In response to a question as to what would happen to existing jobs if the Union was voted in and the Company didn't get more work, Thomas responded,

If we slow down, if we are slow in work, and we want to bring you into the shop for four days, it's going to be tough shit. Sorry,

The Union won't allow that.... [Currently, i]f you have temporary slow downs in your job and you come into the shop and you do whatever you have to do. That kind of stuff won't happen.

In his closing remarks, Thomas also commented that the jobs of part-time workers would

responses to questions dealt with the potential impact Union representation would have on the scheduling and flexibility of the workforce. The Board has addressed Company statements and potential violations of section 8(a)(1) on at least two previous occasions. *John W. Galbreath & Co.,* 288 N.L.R.B. 876 (1988); *Tri–Cast, Inc.,* 274 N.L.R.B. 377 (1985). In *Galbreath,* the Board held that a statement which only predicts union conduct cannot be considered a threat for purposes of proving a section 8(a)(1) violation. *Galbreath* at 877. The Board in *Galbreath* specifically considered statements by a company which stated the company's view on the penalties the union might impose for violations of its constitution or by-laws. In *Tri–Cast,* the Board considered a statement which expressed the employer's expectation that the company could not stay healthy or flexible if under union restrictions. The Board found the statement to be simply a recognition that the union might demand restrictive conditions which could potentially endanger the employer's competitive position. *Tri–Cast* at 377. We find that the substantial evidence of this case does not support a finding that the comments made by Thomas the day before election were meant to suggest retaliatory actions which would be taken upon the election of Union representation. Rather, the comments appear designed to inform the employees of the powers and disadvantages of a union. Based on the precedent provided by *Galbreath* and *Tri–Cast,* we reverse the decision of the Board as to Thomas' statements.

■ The second issue which the Company raises on appeal is whether the Board erroneously found that the Company laid off eleven employees to prevent them from voting in the representation election. The Company asserts that the layoffs were a result of severe economic decline, that employees were chosen for layoff based on productivity levels, and that the Company had previously laid off employees on a permanent basis under similar economic circumstances. The Company further asserts

that there is no evidence that the layoffs were motivated by a desire to discourage Union support. Section 8(a)(3) makes it an unfair labor practice to lay off employees in order to discourage union activities. *NLRB v. A & T Manufacturing Co.,* 738 F.2d 148, 149 (6th Cir.1984). The question of employer motivation for layoffs is a factual question reviewed under the "substantial evidence" standard of 29 U.S.C. § 160(e). *Id.* at 149.

■ Mark Calkins testified before the ALJ that he was a foreman at the time of the layoffs. He was present at a foremen's meeting at which layoffs were discussed and employees with lower productivity identified for lay off purposes. Calkins further testified that either Hovey or Thomas stated at the meeting that the word "permanent" was to be placed on each layoff slip so that they would not be eligible to vote in the representation election and so that persons not working for Hovey could not vote. Hovey, Thomas, and a former foreman, Brian Roberson, contradicted this testimony. As we noted above, the ALJ and the Board are entitled to make credibility determinations. However, in this case, the evidence of an economic downturn and past layoff practices indicate that the Company's decision to lay-off the employees was not made in an effort to affect the election results. We find, therefore, that the decision of the ALJ with respect to the propriety of the layoffs is not supported by substantial evidence.

Foreman Calkins' testimony is only relevant to the wording of the layoff slips. Nothing in his testimony disputes the Company's asserted economic motivation for the layoff. In fact, Calkins' testimony buttresses the Company's assertion that the men chosen for layoffs were selected based solely on their level of productivity. Roberson and Calkins testified that the foremen selected the employees for layoff and that the selection was unrelated to the employees' support of the Union. Further, it

---

be affected by the Union. He stated that the Company would lose its ability to be flexible

when the workload was down.

is clear that in the past, under similar economic circumstances, the Company had permanently laid off employees. The employment level at the Company has never risen above 54 persons subsequent to the layoffs, consistently down from the 70 employees the Company had prior to the layoffs. The Union points to the fact that the Company asked the laid off employees to reapply following the election as evidence of the improper purpose for the layoffs. This assertion fails to address the fact that 22 employees quit after the election. The subsequent hiring was done only to raise the number of employees back to the level following the layoffs. These facts indicate that the ALJ erred in finding that the layoffs were discriminatorily motivated.

■ The only remaining question is whether writing "permanent" on the layoff slip to prevent the employees from voting was improper. The Board made a factual finding that the Company had previously laid off employees on a permanent basis. The Company, based on the economic forecast and the anticipated staffing requirements, did not anticipate being able to recall the former employees. The layoffs would have been permanent if 22 employees had not quit subsequent to the layoffs. Except for the job openings resulting from the voluntary terminations, the Company would have been unable to recall any of the laid-off employees. Because the Company viewed the employees as permanently laid off, it committed no unfair labor practice by noting this permanent status on the layoff slips. The notation did not deprive the employees of any rights.

### IV.

For the reasons stated above, we AFFIRM in part and REVERSE in part the decision of the National Labor Relations Board. The proceeding is REMANDED to the Board for a new order taking into account the portions of its decision which have been REVERSED.